## CATHERINE MORRISSEY

*v.*

## STATE OF ILLINOIS.

*Opinion filed November 19, 1914.*

1. CONTRIBUTORY NEGLIGENCE—*when claimant not chargeable with.* Where a claimant, who in passing over a bridge has no knowledge of any of its defects, he will not be chargeable with contributory negligence.

2. NOTICE OF DEFECT—*what is.* An examination of the bridge by an employee of the Illinois and Michigan Canal Commission, after notice of a defect in the bridge, is notice to the State.

3. CONSTRUCTIVE NOTICE—*what constitutes.* The evidence in this claim also shows, that the defect in the bridge had existed for such length of time as would constitute constructive notice.

4. MUNICIPAL OFFICERS—*duty as to bridges, etc.* A duty is imposed upon municipal officers to use ordinary care in keeping the bridges, culverts, etc., of such municipality in safe condition for public travel, and this involves the anticipation of defects that are the natural and ordinary result of use and climatic influences. (*City of LaSalle* v. *Porterfield*, 138 Ill., 114; *Sherwin* v. *City of Aurora*, 257 Ill., 458.)

5. ACCEPTANCE—*what will not constitute.* The replanking of the bridge by the corporate authorities of the Village of North Utica, following an offer by the Canal Commissioners to turn the bridge over to such authorities, will not amount to an acceptance of such bridge by the corporate authorities of North Utica.

6. GOVERNMENTAL FUNCTION—BUSINESS ENTERPRISE—*where State exercises former no liability attaches—but in case of latter liability does attach.* Where the State exercises a governmental function only, no liability attaches, whereas, if it is engaged either wholly or partially in a business enterprise, and the exercise of the governmental function cannot be disassociated from the business enterprise, liability attaches.

7. HOLMES v. STATE—*overruled.* The case of *Holmes* v. *State*, 1 Court of Claims Rep., 324, overruled.

8. STATE—*may act how.* The State may act in a governmental way along the same lines that an individual may act.

9. SAME—*not a corporation.* The State of Illinois is not a corporation in any sense.

10. CITIES—*may be liable when township or school district would not be.* A city may be liable in damages in case where a township or school district would not be.

11. SAME—*no liability where it acts governmentally.* Where a city exercises a governmental function, no liability in tort attaches.

12. CANAL COMMISSIONERS—*not a corporation—are what?* The Canal Commissioners are not a body corporate. Such commissioners and their employees are public servants under the exclusive control of the State, and they derive their powers solely by virtue of the statutes of the State.

13. LIABILITY OF STATE—*rests on statute.* Where the State has assumed liability for injuries to those in its service, such liability is assumed by virtue of some statute of the State.

14. GOVERNMENTAL FUNCTION—*conduct of University of Illinois is, exercise of.* The State in conducting the University of Illinois acts in a governmental capacity, and is not liable in tort. (*Jones* v. *State, supra*), and the penitentiaries in the manufacture of goods and wares act governmentally, and are not liable in tort. (*Taylor* v. *State, supra*). The cases of *Minear* v. *State Board of Agriculture*, 259 Ill., 549; *Hern* v. *Iowa State Agricultural Society*, 91 Ia., 97; *Berman* v. *Minnesota State Board of Agriculture*, 93 Minn., 125; *Trustees of Illinois Industrial University* v. *Board of Supervisors of Champaign County*, 76 Ill., 184, and *Chicago* v. *Williams*, 182 Ill., 135, cited by the Court.

15. JURISDICTION—*Act creating Court did not increase liability of State.* The Act creating this Court did not increase or enlarge the State's liability.

16. STATE—*where stockholder in corporation—liable.* Where a State becomes stockholder in a corporation, it divests itself, for the purpose of the business, of its sovereign capacity and liability attaches.

17. RESPONDEAT SUPERIOR—*doctrine of not applicable to State.* The doctrine of *respondeat superior* does not apply to the State.

Chipperfield & Chipperfield, Browne & Wiley, Duncan, Doyle & O'Conor, Howard H. Bayne, George P. Hills, Gleim & Colwell, for Claimants:

The canal is a business enterprise.
*Holmes* v. *State of Illinois*, 1 C. of C. R., 324.

The State is liable to individuals for the misfeasance, laches, acts or neglect of its officers, agents and servants, when such officers, agents and servants, in what they do, are not proceeding in the mere carrying out of the purely governmental policy or functions of the State, but are doing those things, which have relation to the management of corporate or private concerns of the State conducted for profit, as a business enterprise.

*Bank of U. S.* v. *Planters Bank of Ga.*, 9 Wheaton, 904; *Hand* v. *Brookline*, 126 Mass., 324; *Scott* v. *Manchester*, 1st

Hurlstone & Norman (English case), p. 59; *Scott* v. *Manchester*, 2d Hurlstone & Norman, 208; *Oliver* v. *Worcester*, 102 Mass., 489; *Hill* v. *Boston*, 122 Mass., 344, 358, 359; *Western Saving Fund Society et al.* v. *Philadelphia*, 31 Penn. St., 185, 189; *Bailey* v. *Mayor, etc.*, 3d Hill (N. Y.), 531, 539; *City of Chicago* v. *Williams*, 182 Ill., 135; *Barnard & Co.* v. *County of Sangamon*, 190 Ill., 116; *City of Chicago* v. *Sexton*, 115 Ill., 230; *County of Cook* v. *Harms*, 108 Ill., 151; *City of Chicago* v. *Selz, etc.*, 202 Ill., 545; *Culver* v. *City of Streator*, 130 Ill., 238.

The State of Illinois not only collects toll for passage over the canal, of boats and barges, but receives rent from the real estate owned in connection with this canal. Also sells ice and water to institutions along its banks, and further derives considerable revenue from water power.

Section 8 of the statute creating the canal, specifies certain revenues not at all compatible with the mere use of the canal as a means of communication by water.

Section 12 of said Act requires the commissioners of the canal to make quarterly statements, and to "pay into the State treasury the balance of all moneys in their hands, except such sums as shall be necessary to be retained by them for the purpose of making repairs upon said canal, locks and dams."

Sections 15 to 24, both inclusive, comprise a system of fines and penalties, and section 27 disposes of the fines, by directing them to be paid into the State treasury.

A *quasi* corporation may, however, by its own voluntary act, become something more than the mere governmental instrumentality, that the State originally made it and intended it to be, and may thus assume a new character. Such a change of character may be brought about, it seems, by the assumption and performance of some special duty, undertaken for its own private advantage which has been either imposed upon it by the legislature with its own consent, expressed or implied, or conferred upon it by the legislature, at its request, or voluntarily assumed without any action on the part of the legislature. When a *quasi* corporation assumes in any one of these ways, the performance of duties for its own private advantage, it thereby ceases to be a pure *quasi* corporation, and becomes to that extent a municipal corporation proper. With such a change in character, comes also a change in the rule of liability, and such corporation is held to be responsible to the same extent as a municipal corporation proper, under like circumstances.

*Thompson* v. *Polk*, 38 Minn., 130 (1888), 36 N. W. Rep., 267; *Schussler* v. *Hennepin County*, 67 Minn., 412 (1897), 70 N. W. Rep., 6; *Rowland* v. *Kalamazoo County*, 49 Mich., 553 (1883), 14 N. W. Rep., 494; *Moulton* v. *Scarborough*, 71 Me., 267 (1880); *Hand* v. *Brookline*, 126 Mass., 324 (1872); *Coburn* v. *San Mateo County*, 75 Fed. Rep., 520, 537 (1896); Williams on Municipal Liability for Tort, Chap. 1, p. 3-7; *Tollefson* v. *City of Ottawa*, 228 Ill., 134.

The State by its own Act created the canal, and for over seventy-six years has operated it, maintaining and rebuilding bridges at this particular intersection, during all that time, except such temporary repairs as were made by the village of Utica.

A municipal corporation acting in its private capacity having the lawful power to do the act, may be estopped the same as an individual. This distinction is clearly set forth in *State* v. *Illinois Cent. R. R. Co.*, 246 Ill., 188. At page 234 the Court denies that the State's charter to the defendant, made the arrangement a partnership and a private business enterprise, and therefore subject to the doctrine of estoppel, and declaring the proper application of estoppel as follows, viz: "That the rule (Estoppel of the State) invoked by appellee on this point, applies only to contracts, where the State goes into business as a partner with individuals, or in competition with her citizens." The Court then quotes with approval *Barnard Co.* v. *Sangamon*, 190 Ill., 116, and *Chicago* v. *Sexton*, 115 id., 230 which were cited by the Court of Claims decision in the *Holmes case.*

The provision for fines for fast driving was for the purpose of preventing injury to the property owned by the State and the State, and not local municipalities wherein the bridges were located, received the fines collected therefor. Constructing bridges over the canal is prevented under penalty, the fine to be paid to the State, the State thereby declaring that it has the sole power over the bridges.

Cities have authority to construct bridges and make public improvements by authority generally delegated by the State, but where the State specifically restrains everybody from in any manner interfering with bridges, repairing, or building new bridges over the canal, the care and maintenance, and the duty of building bridges remains entirely within the sovereign power of the State.

Canal Act. Hurd's Rev. Stat., Chap. 19; *Rouse* v. *Somerville*, 130 Mass., 361.

When constructed by public authority, they are in law regarded as public highways, with the right of tolls attached.

*Rogers et al.* v. *Bradshaw*, 20 Johns, 735; *Riddle* v. *Props. of Locks* 7 Mass., 169; *Commonwealth* v. *Fisher*, 1 P. & W. (Penn.), 462; *Cooper* v. *Williams*, 4 Ham. (Ohio), 253; 1 Wait's, Actions and Defenses, 736; *Rex* v. *Kent*, 13 East., 220.

The fact that the village of North Utica may have been guilty as joint tort feaser with the canal authorities, will not relieve the State of its liability to claimants.

The partial assumption of control of a bridge by a municipality, does not deprive the Canal Commissioners of their rights, or relieve them from the duties and liabilities in respect thereto. The statute imposed certain duties on the city of Marseilles. It was a charter duty imposed upon the village to repair bridges and the fact that the township authorities assumed control of the bridge, did not relieve the village from its duties.

*Village of Marseilles* v. *Howland*, 124 Ill., 547; *Rouse* v. *Somerville*, 130 Mass., 36.

Where private persons cut a canal across a public highway for their benefit held bound to erect and maintain a bridge over same.

*Phoenixville* v. *Phoenix Ins. Co.*, 45 Penn. St., 135.

Claimant was not guilty of contributory negligence .

*Jones* v. *Shelby Co.*, 100 N. W., 520 (Ia.) ; *St. Louis Bridge Co.* v. *Miller*, 138 Ill., 465.

The State was bound to use ordinary diligence, and is liable for want of ordinary care on the part of its servants.

*Weisenberg* v. *Winneconne*, 56 Wis., 667; *City of Chicago* v. *Major*, 18 Ill. 349; *City of Chicago* v. *Hesing*, 83 Ill., 204; *City of Aurora* v. *Dale*, 90 Ill., 46; *Aurora* v. *Hillman*, 90 Ill., 61.

P. J. Lucey, Attorney General, and Arthur R. Roy, Assistant Attorney General, (Stead, Woodward & Hibbs, of Counsel) for State:

The rule of *respondeat superior* does not apply.

*Moody* v. *State Prison*, 128 N. C., 12, 53 L. R. A., 855; *Murdock Parlor Grate Co.* v. *Comm.*, 152 Mass., 28, 8 L. R. A., 399; *Gibbons* v. *U. S.*, 8 Wall., 269; *Town of Waltham* v. *Kemper*, 55 Ill., 346; *Hedges* v. *County of Madison*, 1 Gilm., 567; *White* v. *County of Bond*, 58 Ill., 297; *Symonds* v. *County of Clay*, 71 Ill., 355; *Hollenbeck* v. *Winnebago County*, 95 Ill., 148; *Elmore* v. *Drainage Comrs.*, 135 Ill., 269; *Town of Odell* v. *Schroeder*, 58 Ill., 353; *Nagle* v. *Wakey*, 161 Ill., 387; *Kinnare* v. *City of Chicago*, 171 Ill., 332; *Belt* v. *State*, 1 Ct. Cl. Rep., 266; *Wallace* v. *State*, 1 Ct. Cl. Rep., 268; *Balsley* v.

*State*, 1 Ct. Cl. Rep., 295; *Hatfield* v. *State*, 1 Ct. Cl. Rep., 225; *O'Donnell* v. *State*, 1 Ct. Cl. Rep., 255; *Schmidt* v. *State*, 1 Ct. Cl. Rep., 76; *State Bank of Chicago* v. *State*, 1 Ct. Cl. Rep., 158; *Ross* v. *State*, 1 Ct. Cl. Rep., 175; *Johnson* v. *State*, 1 Ct. Cl. Rep., 208; *Alexander* v. *State*, 1 Ct. Cl. Rep., 214; *Brewster* v. *State*, 1 Ct. Cl. Rep., 215; *Harper* v. *State*, 1 Ct. Cl. Rep., 322.

In constructing, operating and maintaining the Illinois and Michigan Canal, the State is exercising its sovereign political functions.

One of the chief cares and imperative duties of all governments is the aid, encouragement, stimulation and promotion of intercourse, trade and commerce. This duty is universally recognized, and in its exercise, the State is discharging its sovereign functions.

*Denning* v. *State*, 123 Cal., 316; *Sharples* v. *Mayor*, 21 Pa. St., 147; *Rubottom* v. *McClure*, 4 Black (Ind.), 505; *L. S. & M. S.* v. *Ohio*, 173 U. S., 285; 1 Farnham, Water & Water Rights, Sec. 98, p. 443.

It was the exclusive duty and obligation of the village of North Utica to repair and maintain the bridge. No duty on the State to build or maintain bridges .

*People ex rel.* v. *Canal Trustees*, 14 Ill., 402.

The rule of estoppel cannot be invoked, the State being a sovereignty.

On July 4, 1910, claimant, Catherine Morrissey, was walking across a bridge at North Utica, over the Illinois and Michigan canal. There were several people congregated on the bridge with the purpose of witnessing a tub race, which was to be held on the canal as a part of the Fourth of July celebration, then being held in the village. When claimant had reached a point about the middle of the bridge, the bridge suddenly collapsed, and she was caught in the wreckage and her left leg was broken between the ankle and knee, and she received injuries to the back.

The injuries to the leg were very severe, consisting of a compound fracture of both bones between the knee and ankle, the skin being broken and bones protruding. The tibia was broken into fragments. Claimant remained in a hospital at Ottawa from July 5 to August 10, and the leg was kept in a cast until December 1,

and an X-ray examination at that time disclosed that
the fibula had united irregularly and that there was no
bony union of the tibia.  She used crutches until May
1, 1911, and after that time used one crutch until
November, 1911.  Since that time she is unable to walk
without the use of a brace, and never will be able to
use the leg without using a brace.  The leg is one inch
shorter than the right leg, and the prognosis is bad;
in addition she sustained nervous disturbances.

Prior to the injury she was a seamstress, but since
then has been unable to work.  The testimony shows
that she has been put to an expense of about $1,100.00.
The nearest bridge to the bridge in question, in either
direction across the canal, is at a distance of five miles.
North Utica, at the time of the accident, had a popula-
tion of about one thousand, and this bridge was used
considerably by farmers hauling grain, by the Fire
Brick Company which hauled clay, by pedestrians and
for divers other uses.  The canal at the point in ques-
tion runs due east and west.  The street upon which
the bridge was located, was, prior to the establishment
of the village and the construction of the canal, a pub-
lic highway, connecting the old village of Utica, which
lay along the Illinois River, about one mile south of
the present village, with the country north.  Since
the construction of the canal, the old village of Utica
has gone out of existence.

The bridge was erected in 1901, being of the type
known as the "Knock Down Bridge."  It was built
by and under the direction of the Canal Commissioners,
and was of a type common along the canal.  It was a
truss bridge, constructed with two top chords and with
perpendicular beams or rods, which ran down from
the top chords to the timbers beneath.  The top chords
were supported on slanting chords called ell chords,
which in turn rested on iron shoes, which rested upon
piers on either bank of the canal.  The shoes were like-
wise connected with each other by a succession of iron
rods, which ran the length of the bridge, to prevent

them from spreading.    The perpendicular rods, connected with timbers running crossway of the bridge, called needle beams, upon which were laid stringers, and across which in turn was laid the floor of the bridge.

The weight of the bridge was first supported by the top chords, and in turn by the ell chords and shoes resting on the piers.  The bridge was calculated to sustain from fifty to seventy-five tons without danger.

In the summer of 1908, a sidewalk was put upon the west side of the bridge by the village of Utica.  It was bolted to the timbers underneath the bridge, but its construction in no way weakened the structure.  The Canal Commissioners had knowledge of the fact that this sidewalk was there.

On the day of the accident in question, there were perhaps one hundred people on the bridge, but the evidence shows, that this bridge had at many times previous, supported a far greater weight of clay wagons and teams, traction engines, droves of cattle, etc.

At the time the bridge collapsed, there was no warning in the way of cracking of timbers, so that the people could get off the bridge.  There was no sign or notice of danger on the bridge.

It is evident that the southwest ell chord was rotten, and several of the exhibits in the case were pieces of the various chords which were rotted.

About two months before the accident, the superintendent of the canal made an examination of the bridge at the request of the village authorities, which examination consisted of rapping the timbers with a wrench and using his knife.  It is apparent that it was but a very superficial and cursory examination, as a thorough examination would have undoubtedly shown the defective condition of the structure.

Claimant contends, that she herself was in the exercise of ordinary care; that the bridge was the property of, and under the control of the State; that the State

was negligent; that the State, in the conduct of the canal, was not exercising a governmental function, but was conducting purely a business enterprise; that if there is any liability on the part of the village, it is concurrent with that of the State.

The evidence further shows, that the Canal Commissioners, by resolution, attempted to turn the bridge over to the village of North Utica, but there is no evidence of any acceptance by the village, and while there is evidence, that the village exercised some jurisdiction over the bridge, at the same time, the Canal Commissioners also exercised some jurisdiction, and the fact has crept into the evidence, that the bridge to replace the fallen structure, was constructed by, and at the expense of the State, through the Canal Commissioners.

There is no dispute as to the principal facts in the case, *i. e.*, the accident and its cause, the injury and the extent thereof; and the questions involved are very largely purely questions of law.

We will discuss first, the question as to claimant's care or lack of care, and the negligence of the defendant:

Claimant had no knowledge of any defects in the bridge, or of any danger incident thereto. She was walking across the bridge when it collapsed. The mere statement of these facts, gives evidence, that claimant was not in any way negligent.

Applying the common rule as to notice on the part of the State of defect in construction, assuming for the time being, that the State owed a duty, we are of the belief, that the State had notice of the defects and danger. An examination was made by an employee of the canal commission about two months before the accident. The examination was purely superficial, but it was made after the receipt of notice of defect. From the testimony in the case, and from the examination of the exhibits, it must be evident, that this examination was indeed entirely superficial, and in no sense thorough, else the defects complained of, would have been

discovered.    In this particular, the State, by its employee, charged with the duty, was negligent.  Aside from these facts, this defect must have existed for such a length of time, that the rule of constructive notice would apply.

In the *City of LaSalle* v. *Porterfield,* 138 Ill., 114, quoted with approval in *Sherwin* v. *City of Aurora,* 257 Ill., 458, the Supreme Court said: "* * * It is the duty of municipal officers to use ordinary care in keeping its bridges, culverts, etc., in a safe condition for public travel, and this involves the anticipation of defects that are the natural and ordinary result of use and climatic influences * * *." This statement of the law is in like manner, applicable to the State, if it maintained the bridge, not in a governmental capacity.

We naturally now turn to the consideration of whether or not the State exercised any ownership or control of the bridge in question.

The evidence on this phase of the case is quite voluminous, and there is some conflict.  In an endeavor, however, to reconcile the somewhat contradictory evidence of the parties, and to apply the law thereto, we will first briefly state our conclusions on the facts.

At the time of the accident, the State had operated the canal upwards of seventy-five years, and during that time had maintained a bridge at this particular highway crossing.  The highway crossing at this point was in existence before the canal was built, and the building of the canal was necessarily subject to the rights of the public in the highway, and in recognition of this fact, bridges have been built and maintained at this point of crossing.  On November 7, 1902, the Canal Commissioners served a notice upon the village of Utica, wherein, after stating that the law would not impose any duty upon them to build, maintain or keep in repair any bridges over the canal, but that such duty rested upon the village, the commissioners notified the village, that they would not build any bridges across the canal, that they would not thereafter maintain or

keep any of the bridges over the canal in repair, and, that as soon as said bridges became in need of repair, the commissioners would be compelled to close or remove them, unless some other arrangements were made. This was followed in the same notice by the statement, that the Canal Commissioners "hereby offer to deliver to you, and transfer to you, the ownership of all bridges," which were built by the State, upon proper terms to safeguard and protect the canal.

This notice was received by the village board of North Utica on December 2, 1902, and referred to the village attorney. On December 1, 1903, the village board ordered the planking of the canal bridge.

There is no evidence of any actual acceptance by the village of the bridge, unless it be the fact, that the village board ordered the planking of it. The Canal Commissioners evidenced having had no faith in the efficacy of their notice, as the record shows that the State offered evidence, that at a meeting of the Canal Commissioners, held on July 12, 1910, it was voted to erect a new bridge in place of the one that was destroyed, and a new bridge was erected by the Canal Commissioners. We do not believe, that the mere fact that the village board replanked the bridge, was an acceptance of the bridge by the village from the State. It is undoubtedly the fact, that this work was done by the village because the condition of the bridge was such, due to the negligence on the part of the Canal Commissioners, that the work had to be done.

The evidence leads us to believe, that the commissioners themselves, did not take the notice, which they served upon the village, in any way seriously, nor did they consider, that they had parted with the ownership of the bridge. On receipt of a letter from the village president, a few weeks prior to the accident, the Canal Commissioners sent an inspector to make an inspection, and after the collapse of the bridge, the canal authorities cleared away the wreckage, evidencing the ownership of the structure by the State, by removing the timbers to Lockport.

The most that can be said in favor of the State's contention as to the ownership of this bridge, would be, that the village exercised some jurisdiction over it and might be jointly liable with the State, in a proper case, for damages.

We do not agree with counsel for the State in their contention, that there is no evidence that the highway of which this bridge was a part, existed prior to the building of the canal. The evidence of John L. Clark, a man eighty years of age, who resided in the Township of Utica from 1834 to 1883, establishes this fact.

Up to this point it may be said, that if the status of the State, in the case at bar, was the same as that of an ordinary body corporate or an individual, the duty of this Court, with reference to determining the liability of the defendant, would be clear, but we are now called upon to determine the status of the State with reference to the manner of its control of this canal. If the State exercised governmental function only, then there can be no liability, as has been repeatedly held by this Court, and courts of last resort generally. If, on the other hand, the State was engaged in a private enterprise, we will say to the extent if it was but partially so engaged, and the exercise of governmental function could not be dissociated from the private, then, of course, a liability would attach.

We are asked by the State to decide this case squarely contrary to the opinion of this Court, in the case of *Holmes* v. *State,* 1 C. of C. R., 334, and likewise contrary to the opinion of our immediate predecessors in office, who passed upon a demurrer filed by the State on which this, and other questions were raised. In the *Holmes case,* the facts were materially the same as in the case at bar, and the Court in that case found for the claimant. On a demurrer in this case, decided June 15, 1912, as before stated, the contention of the State was overruled.

If we are to be guided solely by the precedent established by this Court, in this particular instance, we

might again say our course would be clear, but we deem it our duty to consider the precedents of courts of last resort, and to give to the opinions of our own Supreme Court, far greater weight than to the precedents established by this Court.

An examination of the cases leads us irresistibly to the conclusion, that the test of the capacity in which the State acts is, not what its agents may have been doing, but, it is to be determined under what authority or law the agents were acting, and whether or not the State retains sole control of the agency involved. It cannot be said, that the State cannot act governmentally along exactly the same lines, that a private individual may act. We can readily appreciate, that the leasing of privileges to cut ice or power privileges may be, in their nature, private enterprise, yet on the other hand, it cannot be said that the State in the exercise of governmental function, cannot do these very things. The State is not a corporation in any sense of the word. A city is subject to liabilities, to which a township or a school board or a state are not liable, because it has a corporate entity. In those acts which are enjoined by law on a city, a city acts governmentally, and no liability attaches for negligence of omission or commission by its officers or agents. In this case, the Canal Commissioners are not in any sense a body corporate. If they were, this action would be brought against them as such body, and not against the State. The State, in the discretion of its legislature, may change the official organization of the canal commission at will, and the Canal Commissioners and their employees are, in every sense of the word, public servants, under the complete control and direction of the State. Whatever of authority is vested in the commission or its employees, is either specifically provided for by statute, or is necessarily incidental thereto. The conduct of the canal, is solely within the control of the State, and measured by the test, as heretofore stated, it would appear, that in the conduct of the canal, the State acts solely in a governmental capacity.

The *Holmes case* is practically *sui generis,* with respect to the holding of this Court in the past, in holding that the State entered into a private business enterprise. There are cases, wherein the State has assumed responsibility for injuries sustained, even when the defense of the exercise of governmental function might have been interposed, but this is done only by statute, and the State clearly has the right to do that; for instance, in the Military and Naval Code, it is provided, that one in the service injured while on duty shall be compensated therefor, so the State could have enacted that one injured through negligence of the State, on the canal, should be compensated, but the difficulty confronting the claimant is, that there is no statute that so provides, and in the absence of such statute, it is the opinion of this Court that the finding in the *Holmes case* should not be followed.

The State of Illinois, in many of its institutions and branches of government, does things which private individuals likewise do. For instance, at the University of Illinois, tuition is charged, students are employed in various capacities, and the same things are done in other universities, privately owned, yet, this Court has repeatedly said, that the State in the conduct of the university exercises a governmental function, and we have held, in *Jones* v. *State,* October Term, 1913, that there can be no recovery arising in tort at the university.

The penitentiaries, surely governmental in their nature, have in the past made and sold large quantities of goods of various kinds, undoubtedly at a profit, but persons injured while at work, whether convicts or employees of the State, have been denied a recovery because of the nature of the institution. *Taylor* v. *State,* October Term, 1913. The Supreme Court of Illinois, in *Minear* v. *State Board of Agriculture,* 259 Ill., 549, in its opinion filed October 28, 1913, which it will be noted is subsequent to the decision on the demurrer in this case by our predecessors, discusses a

question similar to the one in the case at bar. At the Illinois State Fair, plaintiff paid admission to the grounds, and while on an elevated seat was, due to the breaking of the stand in which he was seated, thrown to the ground and injured. The case has many points of similarity with the one under consideration with respect to the legal questions involved. Plaintiff in that case, sued the State Board of Agriculture, under the section of the statute authorizing the board to be sued. Under the statute the State Board of Agriculture is authorized to hold its fairs. Persons holding fairs can and do act in private capacities, but this is no reason why a state cannot do the same thing. It was argued by plaintiff in the *Minear case,* that the State Board of Agriculture acted both governmentally and privately, but the Supreme Court held that it "was created as an arm or agency of the State for the purpose of managing and conducting a department of the State, and all the powers conferred and duties enjoined upon the board were for the purpose of enabling it to manage the department in such manner as to best promote the objects of its creation." In the case of *Hern* v. *Iowa State Agricultural Society,* 91 Ia., 97, is a statement quoted in the *Minear case.* "The only question for us to determine is as to the liability of the society for the acts complained of, and at the outset it is important to have in mind that the society is in no sense a corporation for pecuniary profit. It is an agency of the State. It exists for the sole purpose of promoting the public interests in the business of agriculture. Its public character more fully appears when we consider that its organization is provided for by statute; that it has no stockholders; that by law the president of each county agricultural society in the State, or other delegate therefrom, duly authorized, is made a member of the board of directors; that said board is required to make annual reports to the Governor, which are to be distributed throughout the State; that the powers of the board are prescribed by statute.

\* \* \* Not being a corporation for pecuniary profit, the defendant society's liability is not controlled by the rules of law applicable thereto. The society is an arm or agency of the State, organized for the promotion of the public good and for the advancement of the agricultural interests of the State. It would be manifestly wrong to permit its funds to be used to pay damages arising out of the commission of wrongful acts by its officers and servants and which are in no wise connected with the object and purpose of the society's creation.''

In the case of *Berman* v. *Minnesota State Board of Agriculture,* 93 Minn., 125, cited in the *Minear case,* the Court held, that the defendant was a department of the State, and said ''the necessary result of this conclusion places the society directly under the exclusive authority of the State, which may change its officers or its organization and provide for different regulations for the government of the fair, as the best interests of the public may, in the judgment and wisdom of the legislature, hereafter determine. Hence for such injuries as plaintiff claims to have sustained an appeal to the legislature furnishes the only redress, and we must assume that it will be granted if deserved.''

And the *Minear case,* the Court, in holding that the State Board of Agriculture is a branch of the government, held that it could not be sued in tort. We cannot see any difference in principle between that case and the case under consideration.

In the case of *Trustees of Illinois Industrial University* v. *Board of Supervisors,* 76 Ill., 184, an attempt was made to tax the lands of the Illinois Industrial University, and our Supreme Court held that a tax could not be levied, as the university was property of the State. On page 187 the Court said: ''\* \* \* it will be observed that the State retains the power of appointing its trustees, and, no doubt, has power, through agents other than the trustees, to sell and dispose of the property of the institution, or they may, at

pleasure, amend or even repeal the charter, as public policy or the interest of the university may require.'' It would appear, that the Supreme Court then had in mind, that the test of a State's liability to pay taxes would be whether or not the State retains sole management and control.

In *Chicago* v. *Williams*, 182 Ill., 135, on page 138 the Court said: ''*  *  *  where acts are done by the officers of towns and cities in their public capacity in the discharge of duties imposed by the law for the public benefit and for the promotion and preservation of the public welfare, no private action lies unless the right to bring it is expressly conferred.'' It must be conceded in this case, that all lawful acts done by, or omissions of the Canal Commissioners, or their agents, are the acts and omissions of public officers, acting in their public capacities for which there can be no recovery in tort, and for wrongful acts of such officers there can certainly be no recovery because the doctrine of *respondeat superior* does not apply to the State, and it is not liable for malfeasance, misfeasance or negligence of its officers or agents in the absence of a statute creating such liability. *Ross* v. *State,* 1 C. of C. R., 175, and many other cases decided by this Court, holding to the same rule.

It is not contended by claimant that such statute exists, and this Court has repeatedly held, that the statute which creates this Court does not increase or enlarge the liability of the State, but provides only the forum, wherein claims may be adjudicated according to the principles of equity and justice, except as otherwise provided by law.

We have seen cases where a state has become a stockholder in a corporation, and the holding that it thereby divests itself for the purposes of the business of that corporation, of its sovereign capacity, but such cases are clearly distinguishable from cases like the one at bar, and those above cited, wherein the State retains sole management and control. When we consider that

the State Board of Agriculture, when it charges admission to the State fair, is held not to be engaged in private business enterprise, but to be carrying out solely the purposes of the agricultural department of the State, and exercising governmental functions only, we cannot agree with the ruling in the *Holmes case.*

This appears to be a harsh rule, but we do not make the law and can only interpret it as we find it, and much as we would like to find a judgment for the claimant in this case, considering the facts as they are, we must reject this claim with the statement, however, that if it were in our power to make an award, we would in this case award to the claimant the sum of $7,500.00. The only negligence in this case was the negligence of servants of the State. Claimant herself was in the exercise of reasonable care for her own safety, and had no reason to suspect that there was any danger in going upon the bridge.

This claim is accordingly rejected, but without prejudice to the claimant, and the judgment of this Court herein shall not be considered as a bar to her right to present her claim to the legislature.